**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | : | |
| | : | |
| **v.** | : | |
| | : | **Criminal No.   25-cr-00058-1 (CJN)** |
| | : | |
| **LAURA LEE DUDLEY,** | : | |
| | : | |
| **Defendant.** | : | |
| | : | |

**GOVERNMENT'S MEMORANDUM IN AID OF SENTENCING**

From at least January 1, 2020, continuing through at least June 30, 2022, defendant Laura Lee Dudley, ("the defendant"), was part of a conspiracy with co-defendant Daniel Park ("the co-defendant"), to illegally gain money and property from their then employer, a non-profit organization ("Organization A"), through their unauthorized use of Organization A's credit card, which they used to order products and gift cards for their personal use. Defendant Dudley chose to steal from her employer repeatedly over the course of two years, in which she personally gained $333,825.00 of the $393,340.57 stolen from Organization A.

The government recommends that the Court impose a term of incarceration at the low end of the United States Sentencing Guidelines ("U.S.S.G.") range (15 months to 21 months) based on a total offense level of 14 for the offense, which is within Zone D of the Guidelines. *See* PSR at ¶ 102. A sentence of 15 months' imprisonment –the bottom of that guideline's range, along with the imposition of a term of 36 months supervised release, an order to pay full restitution and imposition of a criminal forfeiture money judgement, is appropriate considering all of the factors the Court should review.

I.    **PROCEDURAL HISTORY**

On February 27, 2025, a federal grand jury in the District of Columbia returned a twenty-four count Indictment charging defendant Laura Lee Dudley ("defendant" or "Dudley") and co-defendant Daniel Park ("co-defendant" or "Park") with conspiracy to commit mail and wire

fraud, in violation of 18 U.S.C. § 1349; mail fraud, and aiding and abetting, causing an act to be done, in violation of 18 U.S.C. §§ 2, 1341; wire fraud, and aiding and abetting, causing an act to be done, in violation of 18 U.S.C. §§ 2, 1343. On October 21, 2025, pursuant to a plea agreement, Dudley pled guilty to Count One of the Indictment, conspiracy to commit wire and mail fraud, in violation of 18 U.S.C. § 1349. ECF Nos. 31-32. A sentencing date is currently scheduled for April 22, 2026, at 2:00 p.m.

## II.    FACTUAL BACKGROUND

Dudley and her co-defendant were previously employed by Organization A, a non-profit organization with employees in the District of Columbia and around the world, which provided educational programs, training, and development assistance in the Middle East and North Africa. Dudley worked for Organization A beginning in January 2008 until she was terminated on May 3, 2022.[1] ECF No. 32, ¶ 4. Dudley was initially hired as an administrative assistant in the Administration Department at Organization A's headquarters located in Washington, D.C., but on or about August 2015, she was transferred to work in the Accounts Receivable Department as an accountant. *Id*. Dudley's position as an administrative assistant in the Administration Department (and later Park's position) was responsible for purchasing supplies using a corporate credit card to make purchases on behalf of Organization A's headquarters. *Id*., ¶ 8. Neither conspirator was permitted to use the corporate credit cards for personal purchases. *Id*., ¶ 7. The defendant was also responsible for receiving and passing out corporate credit cards to designated employees. *Id*., ¶ 6.

---

[1] Co-defendant Park was employed with Organization A between April 20, 2015, and July 21, 2022, as an administrative assistant in the Administration Department – Dudley's prior position.

From on or about January 1, 2020, continuing through at least June 30, 2022, within the District of Columbia and elsewhere, Dudley and co-defendant Park participated in a fraud and theft scheme in which the conspirators, without authority, used their employer's corporate credit card to purchase items online through Amazon, such as gift cards, electronic equipment, and beauty products, for their personal use. *Id*., ¶¶ 12, 15, 16. Defendants caused these personal purchases to be mailed to Organization A's headquarters and their personal residences. *Id*., ¶ 15(j). Organization A paid for defendants' personal purchases by paying its credit card bill every month. *Id*., ¶¶ 11, 13.

Organization A's employees, including the defendant, were required to report and records any purchases and expenses they made using the corporate credit cards into an electronic purchase and expense log ("log") and to provide a scanned copy of the corresponding bill and/or invoice in support of the purchase or expense. *Id*., ¶¶ 9-10. Each month a new log was generated and was supposed to be reconciled against monthly credit card statements. To conceal their scheme, defendants failed to report and record their unauthorized purchases and expenses using organization A's credit cards on Organization A's log. *Id*., ¶ 15(c). In addition, co-defendant Park created for himself and Dudley numerous fake invoices which were uploaded into the log to cover their personal purchases. *Id*., ¶ 15(e)-(i). In total, the loss amount to Organization A from defendants was at least $393,340.57. *Id*., ¶ 13. Of that amount, the government can attribute $333,825 worth of goods to Dudley, and $59,515.57 to co-defendant Park.

From materials reviewed, it appears that Dudley initiated the scheme, and co-defendant Park independently did the same thing. However, at some point they knew the other was conducting the same scheme and then conspired to continue the scheme and to conceal it from Organization A. Dudley, who was part of the finance department and was tasked with

reconciling charge accounts, assisted co-defendant Park by volunteering to reach out to Park to obtain invoices to support fraudulent purchases. *Id.*, ¶15(h).  Co-defendant Park assisted the defendant by preparing false invoices to cover some of Dudley's purchases which were uploaded onto Organization A's purchase log. *Id.*, ¶15(i).

The scheme was enabled by the Covid-19 pandemic because co-defendant Park was one of the few employees required to work in-person, so he was able to receive Amazon packages delivered to himself and Dudley at work.[2] Organization A discovered co-defendant Park's fraud when the new Chief Financial Officer questioned the amount of money being spent on Amazon purchases for the Administration Department. In reviewing materials obtained during the investigation, law enforcement uncovered Dudley's participation in the scheme.

## III.     STATUTORY PENALITIES

For a violation of 18 U.S.C. § 1349, as set forth in Count One of the Indictment, the defendant faces a maximum sentence of twenty years of imprisonment; a fine of up to $250,000 or twice the pecuniary gain or loss of the offense; a term of supervised release of up to three years; mandatory restitution; an obligation to pay any applicable interest or penalties on fines and restitution not timely made; a forfeiture money judgment; and a $100 special assessment pursuant to 18 U.S.C. § 3583(b)(2).  *See* PSR ¶ 5.

## IV.     THE APPLICABLE SENTENCING GUIDELINES RANGE

The Supreme Court has declared that, in terms of determining an appropriate sentence, "[a]s a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark." *United States v. Gall*, 552 U.S. 38, 49 (2007) (citation

---

[2] Dudley also came into the office from time to time to work and pick up her Amazon purchases.

omitted) ("a district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range."). *Id*. Although advisory, the Guidelines assure some measure of uniformity in sentencing, fulfilling a key Congressional goal in adopting the Sentencing Reform Act of 1984.  Reference to the Guidelines, while carefully considering the factors set forth in 18 U.S.C. § 3553(a) particularly relevant to an individual defendant, minimizes the disfavored result of disparate sentences by different judges for the same criminal conduct.  Therefore, the Supreme Court has held that districts should "remain cognizant of [the Guidelines] throughout the sentencing process." *Id*., at 50 n.6.

According to the Presentence Report, the U.S. Sentencing Guidelines calculation for the defendant's offense. Conspiracy to commit, in violation of 18 U.S.C. § 1344(2) and 2:

| | |
|---|---|
| Base Level Offense §§ 2X1.1(a), 2B1.1(a)(1)(A) and (B) | 7 |
| Specific Characteristic §2B1.1(b)(1)(G)<br>(More than $250,000, but less than $550,000) | +12 |
| Sub-total | 19 |

Because the defendant pled guilty to a conspiracy that has two different objects, the initial guideline that applies is U.S.S.G. §2X1.1(a). *See* PSR ¶ 44. The base offense level is calculated using the base offense level from the guideline for the substantive offenses, plus any adjustments from such guideline for any intended offense conduct that can be established with reasonable certainty. Pursuant to U.S.S.G. § 1B1.2(d), a conviction on a conspiracy charge with two objects should be treated as if the defendant was convicted on a separate count of conspiracy for each underlying offense. *Id.*, ¶ 45.  The applicable guideline for violations of 18 U.S.C. § 1341 (mail fraud) and 18 U.S.C. § 1343 (wire fraud) is U.S.S.G. §2B1.1. *Id*. The substantive offenses of the conspiracy are grouped together pursuant to USSG §3D1.2(d). *Id.*, ¶46.  The PSR calculated the

defendant's base level offense as 19. *Id.*, ¶¶ 43-52. This includes a base offense level of 7, for Count One, pursuant to U.S.S.G. §§ 2B1.1, 2X1.1(a); an additional 12 levels for a loss of more than $250,000, but less than $550,000, pursuant to U.S.S.G. § 2B1.1(b)(1)(G).

The PSR agreed that Dudley should receive a 3-level reduction for acceptance of responsibility, pursuant to U.S.S.G. §§ 3E1.1(a) and (b). *Id.* ¶¶ 53-54. The defendant has no significant criminal history (*id.*, ¶¶ 59-61) and meets the criteria for a Zero-Point Offender. *Id.* ¶¶ 55. Therefore, under U.S.S.G. § 4C1.1, there would be a two-level reduction, bringing her offense level to 14 (15-21 months' incarceration). Based upon the above Guidelines calculation, the government recommends a term of incarceration at the low end of the guideline range – a 15-month term of incarceration followed by a 36-month term of supervised release.

Neither the U.S. Probation Office nor does the government recommend a fine based upon Dudley's financial condition and her anticipated financial obligations in this matter to pay restitution to the victim non-profit organization and a criminal forfeiture money judgment, *Id.* ¶¶ 100.

## V.    **RECOMMENDATION**

### A.    **Analysis of the Sentencing Factors Under Section 3553(a)**

After calculating the applicable Guidelines range, the Court should next consider all the applicable factors set forth in 18 U.S.C. § 3553(a). Indeed, the Guidelines themselves are designed to calculate sentences in a way that implements the considerations relevant to sentencing as articulated in Section 3553(a). *Rita v. United States*, 127 S. Ct. 2456, 2463 (2007). The Court must impose a sentence that is sufficient but not greater than necessary to reflect the seriousness of the offense to promote respect for the law, to provide just punishment, to afford adequate deterrence, to protect the public from further crimes of the defendant, and to provide

the defendant with needed educational or vocational treatment. 18 U.S.C. § 3553(a)(2). The

Court also must consider the nature and circumstances of the offense, the history and

characteristics of the defendant, the kinds of sentences available, the sentencing range under the

Guidelines, any relevant policy statements, the need to avoid unwarranted sentencing disparities,

and the need to provide restitution to the victims.  18 U.S.C. § 3553(a)(1)-(7).

### 1.  Nature and Circumstances of the Offense and Its Seriousness

The nature and circumstances of the scheme demonstrate Dudley's clear criminal intent

to defraud the non-profit organization for as much as possible and to use its money for her own

personal benefit. The defendants' scheme to defraud Organization A lasted for years and caused

close to $400,000 in loss to the non-profit organization before the conspirators were caught. The

conspirators were successful because they: (1) were trusted by Organization A; (2)  made

assurances to other employees that they would deal with issues regarding credit card purchases

and the log; (3) purposefully failed to upload many invoices in support of purchases; (4) took

efforts to hide their scheme including creating fake invoices which they uploaded into the log;

and (5) conducted the scheme during the Covid-19 pandemic when few employees were

physically located at the Organization's headquarters. Dudley was terminated on May 3, 2022,

due to her charging $8,000 worth of goods/services to a credit card issued to an overseas

employee, however, at that time Organization A did not have visibility into the extent of

Defendant Dudley's criminal activity. Specifically, when Organization A referred the matter to

law enforcement, it believed that co-defendant Park's use of the Administrative Department's

credit card through its Amazon account was the extent of the fraud. The defendant was able to

hide her conduct longer because many of her purchases were initiated through her personal

Amazon account, not the organization's account. Later, law enforcement uncovered the

conspiracy between the defendants and learned of Dudley's participation in the scheme and the extensive scope of her criminal activities involving hundreds of thousands of dollars' worth of goods and gift cards which were shipped to the defendant. Given that Dudley's salary was approximately $65,000 a year during the scheme, greed appears to be her motivation to steal from her employer.

In a Victim Impact Statement, a representative of Organization A described the impact of defendants' conspiracy and scheme to the non-profit organization, stating:

> The direct financial losses were substantial. Beyond the stolen funds themselves, the organization incurred significant additional costs related to legal fees, forensic accounting, audits, and the implementation of stronger internal financial controls. These activities diverted time and resources from our mission and daily operations, imposing a lasting financial burden.
>
> ***
>
> The actions of these defendants also damaged our reputation and undermined trust both internally and externally. The incident eroded the culture of trust that our organization had built over years and required renewed efforts to reassure stakeholders and restore confidence in our integrity.
>
> ***
>
> While we are a nonprofit organization, the human toll of this crime cannot be ignored. The funds that were stolen reduced our ability to meet our financial responsibilities and our leadership was forced to confront the difficult task of rebuilding a sense of security and shared purpose within our workforce.

*See* Victim Impact Statement. Dudley's criminal action caused not only financial loss to the organization but also caused employees and stakeholders to feel victimized and required Organization A to re-secure their financial accounts and review its oversight.

8

2.      **The History and Characteristics of the Defendant**

The nature and circumstances of Dudley's criminal activity demonstrated her clear criminal intent to defraud her employer of hundreds of thousands of dollars. The PSR does not suggest that defendant Dudley was mentally incapable of avoiding her criminal conduct; instead, she chose to engage in criminal conduct intentionally and repeatedly because it was profitable and she got away with it for an extended period. The defendant is a 45-year-old woman, who was raised in New Hampshire, but who has lived in the greater Washington, DC area for over 30 years. Defendant appears to have had some health issues, but she has sought and received treatment. *See* PSR, ¶¶ 77-84. Dudley does not appear to have any issues with drugs or alcohol.

Dudley went to high school for more than 3 years and later obtained a GED. She also attended college from 2019 to 2025 and obtained a certificate in General Studies in June 2021, an associate's degree in May 2022, and a certificate of Practical Nursing in 2025.

The defendant is currently employed as a Certified Nursing Assistant (CNA). Previously, she was employed as a student Nurse Patient Care Technician (PCT) but resigned due to being charged in the instant offense. The defendant has no criminal convictions.

The defendant married in 2007 and was divorced in 2017. The defendant has two adult children. Since 2018, the defendant has been in a supportive relationship.[3]

Dudley has demonstrated her acceptance of responsibility for the criminal activity outlined in Count One of the Indictment by admitting her guilt of participating in the conspiracy and scheme and agreeing with the facts set forth in the Statement of Offense. While the defendant admitted responsibility for her criminal activity, her acceptance of responsibility was

---

[3] The defendant's partner appears to be under a misconception that the evidence against Dudley is solely based on the co-defendant's statements. *See* PSR, ¶ 74.

9

not immediate – unlike her co-defendant's contrition.

As stated earlier, Dudley's actions were not one isolated incident. She did not commit a one-time out-of-character mistake. On the contrary, Dudley had time to develop the scheme and implement it over the course of years, including getting assistance from her co-defendant to increase the proceeds she received and to hide the scheme. Each time Dudley made a new Amazon purchase for gift cards and/or sundry items using the organization's corporate card or concealed the transactions, defendant made an independent decision to engage in that criminal activity. In addition, there is no evidence that Dudley would have stopped if she had not been caught (using a different corporate card) and fired by her employer.

### 3.    The Need to Promote Respect for the Law and Deter Similar Criminal Conduct

The sentence should reflect the seriousness of the offense, to promote respect for the law, to afford adequate deterrence, and to provide just punishment for the offense. *See* 18 U.S.C. § 3553(a)(2). Importantly, the Court should consider the possible deterrent effect that a sentence in this matter may have on others contemplating committing this type of fraudulent conspiracy and scheme.

Thus, a term of incarceration for the defendant will accomplish the relevant purposes of U.S.S.G. § 3553(a)(2); that is: "(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; [and] (B) to afford adequate deterrence to criminal conduct[.]" Dudley's motivation for conducting the scheme against her employer appears senseless. The defendant was not in poverty and there was little evidence of financial stress at the time of offense reflected in the PSR. Moreover, the types of purchases Dudley made from Amazon were gift cards (cash) or trivial items like beauty products. The proposed punishment in this case fits the nature and seriousness of this crime.  Section 3553(a) is

10

not limited to the necessary sentence to deter the defendant from engaging in further criminal conduct (specific deterrence) but also includes consideration of deterring other potential criminals from engaging in similar conduct (general deterrence). *See, e.g., United States v. Phinazee*, 515 F.3d 511, 515-16 (6th Cir. 2008) ("The plain language of the statute . . . also militates against limiting the authority of the court to specific deterrence. . . . We note that this conclusion comports with the longstanding and uncontroversial practice of considering general deterrence in sentencing."). From the standpoint of general deterrence, the government's proposed sentence at the low end of the Guidelines range, followed by three years of supervised release, an order of restitution and a criminal forfeiture judgment will send a strong message to all who seek to defraud that such acts will not be tolerated.

4.      **The Need to Avoid Unwarranted Sentence Disparities**

The government recognizes that there is a "need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(1)(6). Clearly, to avoid unwarranted sentence disparities, the Courts should first look at the Guidelines, which indicate a level 14, and a suggested range of 15 months to 21 months incarceration.[4] *See* PSR, ¶ 102. The PSR reports the average and median length of incarceration for defendants having a sentence under Guideline § 2B1.1 at a level 14, criminal history category I, are 10 months' and 12 months' incarceration respectively. *Id.*, ¶126. While these statistics may assist the Court in considering the appropriate sentence in this matter, it should not be the deciding factor. Here, Dudley stole over $333,000 from her employer – a non-profit organization that

---

[4] Co-defendant Park received a sentence of 8 months' incarceration, however, co-defendant Park took early responsibility for his and Dudley's criminal activities and his financial gain from the scheme was significantly lower (less than $60,000), whereas Dudley stole close to $330,000. *Id.*, ¶ 32. *See also* ECF No. 40.

provides educational and training opportunities world-wide. An employee victimizing its non-profit employer is particularly egregious because a non-profit's employees are presumably driven by the mission of the organization and not for profit. The defendant had responsibilities relating to the organization's finances, credit cards, and the organization's financial oversight protections. Yet, Dudley and her co-defendant devised scheme to steal from the non-profit and managed to side-step the organization's oversight controls. All of which suggests that a sentence at the low end of the Guidelines range would be appropriate.

**B.    The Defendant Should Be Required to Pay Restitution to the Victims**

As part of her plea agreement, the defendant agreed to pay an order of restitution, which the government has now calculated as $393,340.57, which should be paid jointly and severally with co-defendant Park, and she is obligated by the provisions of the Mandatory Victim Restitution Act of 1996. From law enforcement's analysis, Dudley received the vast majority of the fraud proceeds - approximately $333,825, which should be repaid to the non-profit victim.

**C.    The Defendant Should Be Required to Pay a Forfeiture Money Judgment**

"Criminal forfeiture is not an independent substantive offense, nor is it even an element of an offense.  It is instead 'an aspect of punishment imposed following conviction of a substantive criminal offense.'" *United States v. Day*, 416 F. Supp. 2d 79, 84 (D.D.C. 2006) (quoting *Libretti v. United States*, 516 U.S. 29, 39 (U.S. 1995)), aff'd in part on other grounds and rev'd in part on other grounds, 524 F.3d 1361 (D.C. Cir. 2008).  Criminal forfeiture may take the form of: (1) an *in personam* money judgment against the defendant; (2) forfeiture of specific assets; and (3) forfeiture of "substitute assets" if the directly forfeitable assets are unavailable.  *United States v. Zorrilla-Echevarria*, 671 F.3d 1, 5-6 (1st Cir. 2011) (citation omitted).  Federal Rule of Criminal Procedure 32.2 governs criminal forfeitures.

As part of the defendant's plea, the defendant also agreed to pay a criminal money judgment based upon the amount of proceeds she received from the scheme, which the defendant agreed was $333,825. The government requests that at a money judgement in the amount of $333,825 be imposed at the time of defendant's sentencing. A Consent Order of An Order of Forfeiture should be made part of the Judgement.

## **CONCLUSION**

For the foregoing reasons, the government respectfully recommends the Court impose a term of incarceration of 15 months incarceration, followed by a 36 month period of supervised release, a restitution order in the amount of $393,340.57 to be paid jointly and severally with her co-defendant, a criminal forfeiture money judgment in the amount of $333,825, and a special assessment of $100.

Respectfully submitted,

JEANINE FERRIS PIRRO
UNITED STATES ATTORNEY

BY:    */s/ Diane Lucas*
DIANE G. LUCAS, D.C. Bar. No. 443610
Assistant United States Attorney
United States Attorney's Office
District of Columbia
Fraud, Public Corruption and Civil Rights Section
601 D Street, N.W.
Washington, D.C. 20530
(202) 252-7724
Diane.Lucas@usdoj.gov