**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **v.** | ) | **No.   25-cr-058 (CJN)** |
| **LAURA LEE DUDLEY** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

## <u>DEFENDANT'S MEMORANDUM IN AID OF SENTENCING</u>

Laura Lee Dudley, by her attorney, Maria N. Jacob, submits the following memorandum in aid of sentencing in this matter.

Ms. Dudley is remorseful for aberrant conduct that occurred in a phase in her life, during the COVID-19 pandemic, that she will never again return to, when she was depressed after ending a 20-year abusive relationship and going through an ugly divorce and child custody battle with her ex-husband. Ms. Dudley did not grow up with privilege, rather she was raised in a dysfunctional and unsupportive environment that left her with feelings of rejection and abandonment by her own mother that last until this very day. Ms. Dudley was not given handouts and had to work hard to build a life and career.

Even after the instant offense, despite being fired from a job she was with for three years after her employer learned of the instant indictment, Ms. Dudley pulled herself up and again became gainfully employed. She is a valued member of Watchemsprout Pediatrics where she was working as a Certified Nurse Assistant

1

(CNA) and currently working as a nurse after recently finishing nursing school and passing her RN exam.

Ms. Dudley accepted responsibility for her conduct and acknowledges the severity of what she did to her former employer. However, by the time she was indicted for the instant offense, Mr. Park, her co-defendant, had already entered a plea as he had the opportunity to be the "target" of the investigation. After reviewing the sentencing transcript in Mr. Park's case, it is clear that Ms. Dudley was unfairly characterized as the leader and "mastermind" of this conspiracy. She also did not enter a plea acknowledging an aggravating role and was not assessed such a role by probation.

Notably, Mr. Park did not blame Ms. Dudley for his conduct in his allocution to the Court. In fact, in his proffer to the government prior to the indictment being filed, Mr. Park stated that his conduct and Ms. Dudley's conduct began independently of one another. Therefore, Ms. Dudley respectfully asks the Court to consider the evidence and not to attribute more blame to her based upon the unsupported proffers of counsel that Ms. Dudley somehow was the lead actor in this conspiracy.

Based upon all of the 3553(a) factors, the old age of the offense conduct, Ms. Dudley's progress in the past 5 years, her pre-trial supervision compliance, her lack of criminal history, and her acceptance of responsibility, Ms. Dudley respectfully requests that the Court grant a variance below the guideline range of 15-21 months. Ms. Dudley submits that any period of incarceration would significantly

compromise the upward trajectory she has been on for half of a decade and would compromise her ability to pay restitution.

## I.      Application of the Sentencing Factors

Twenty years ago, the Supreme Court held that "the Federal Sentencing Reform Act of 1984…ma[de] the Guidelines effectively *advisory*." *United States v. Booker*, 543 U.S. 220, 245 (2005). Under *Booker*, the "district courts, while not bound to apply the Guidelines, must consult those Guidelines and take them into account when sentencing." *Id.* at 264 (citing *See* 18 U.S.C. §§ 3553(a)(4), (5)). While holding that district courts should still consider the Guideline calculations and ranges for sentencing purposes, the Supreme Court in *Booker* held that courts must consider all the purposes of sentencing set forth in 18 U.S.C. § 3553(a). Overall, considering *Booker*, courts must treat the Guidelines as one among several of the sentencing factors.

Pursuant to 18 U.S.C. § 3553(a) – as explicitly endorsed by the Supreme Court in *Booker* – sentencing courts should consider the need for the sentence imposed:

> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>
> (B) to afford adequate deterrence to criminal conduct;
>
> (C) to protect the public from further crimes of the defendant; and
>
> (D) to provide the defendant with the needed educational and vocational training, medical care, or other correctional treatment in the most effective manner

Several years after *Booker*, the Supreme Court made clear that the "Court's overarching duty" is to "'impose a sentence sufficient, but not greater than necessary,'" *Pepper v. United States*, 562 U.S. 476, 493 (2011) (quoting 18 U.S.C. § 3553(a)), to comply with "the four identified purposes of sentencing:  just punishment, deterrence, protection of the public, and rehabilitation," *Dean v. United States*, 137 S. Ct. 1170, 1175 (2017); *see also* 18 U.S.C. § 3553(a)(2).

In determining such a sentence, the Court must consider the Sentencing Guidelines, the nature and circumstances of the offense, the history and characteristics of the defendant, the need for the sentence imposed to serve the purposes of sentencing, the kinds of sentences available, the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct, and the need to provide restitution to any victims of the offense.  *Id.* § 3553(a)(1).  In addition, the sentencing court may consider any "information concerning the background, character, and conduct" of the defendant, including age, educational and vocational skills, and mental and emotional conditions.  *Id.* § 3661.

Congress has further provided that:

> [t]he court, in determining whether to impose a sentence of imprisonment, and, if a term of imprisonment is to be imposed, in determining the length of the term, shall consider the factors set forth in Section 3553(a) to the extent that they are applicable, ***recognizing that imprisonment is not an appropriate means of promoting correction and rehabilitation.***

18 U.S.C. § 3582(a) (emphasis added).  With that limitation and considering all the purposes of sentencing, the Court must impose a sentence that is "sufficient, *but not*

*greater than necessary*, to comply with the purposes [of sentencing]." *Id.* § 3553(a) (emphasis added).

Since *Booker*, the Supreme Court reaffirmed that the Sentencing Guidelines are not to be weighed more heavily than other sentencing factors. *See Rita v. United States*, 551 U.S. 338 (2007); *Gall v. United States*, 552 U.S. 38 (2007).  A sentencing court must not simply presume that a sentence within the Guideline range is automatically reasonable or that a sentence within the Guideline range is more reasonable than a sentence outside of the Guideline range. *Rita*, 551 U.S. at 338; *Gall*, 552 U.S. at 46. The sentencing court further should not presume that a sentence outside of the Guidelines range is unreasonable. *Id.* By considering the Sentencing Guidelines along with all the factors set forth 18 U.S.C. § 3553(a), "the sentencing court subjects the defendant's sentence to the thorough adversarial testing contemplated by federal sentencing procedure." *Rita*, 551 U.S. at 351. The appropriate punishment in every case must be designed to "fit the offender and not merely the crime." *Williams v. New York*, 337 U.S. 241, 247 (1949). Consistent with this principle, it is now "emphatically clear" that the "Guidelines are guidelines – that is, they are truly advisory." *United States v. Cavera*, 550 F.3d 180, 189 (2d Cir. 2008).

It is critical for sentencing courts to consider all sentencing factors and to not give undue weight to the Sentencing Guidelines because, as the Supreme Court has long emphasized that "'[i]t has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an

individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue.'" *Gall*, 552 U.S. at 52 (quoting *Koon v. United States*, 518 U.S. 81, 113 (1996)).

Thus, after evaluating the Guidelines along with the other co-equal sentencing factors set forth in 18 U.S.C. § 3553(a), a sentencing court may find that the case falls outside the "heartland" contemplated by the Guidelines, or that "the guidelines sentence itself fails properly to reflect the § 3553(a) considerations," or that "the case warrants a different sentence regardless." *Rita v. United States*, 551 U.S. 338, 351 (2007); *United States v. Booker*, 543 U.S. 220, 259-60 (2005). Ultimately, the central mandate of § 3553(a) requires district courts to impose a sentence "*sufficient, but not greater than necessary*" to comply with the purposes of sentencing set forth in § 3553(a)(2).

### A.    History and Characteristics

Ms. Dudley was born in New Hampshire but ultimately re-located with her family to Maryland when she was only 10 years old. When Ms. Dudley was seven years old, her parents divorced, and her father had primary custody following the separation. Ms. Dudley's mother was unfaithful to her father, which is what led to the divorce.

Ms. Dudley's father remarried shortly after they moved to Maryland in 1991. Unfortunately, this marriage was also not a positive one as Ms. Dudley often observed domestic violence between her father and stepmother. Sadly, Ms. Dudley's stepmother did not warmly embrace her but rather treated her with disdain at

times. Ms. Dudley never felt loved and accepted by her own biological mother and to have that pattern continue with her stepmother was traumatic for her growing up. Ms. Dudley never felt like her mother made her a priority and often felt neglected by her. While her relationship with her father was slightly better, Ms. Dudley did not have a good childhood or positive role models in her life. She was the oldest sibling and so did not have the moral guidance of an older sibling either.

Ms. Dudley met her ex-husband while she was still in high school and surprisingly did not graduate. She did not obtain her GED until 20 years later in 2019. Not having a good example of romantic relationships in her childhood, she allowed her ex-husband to influence her educational and career prospects. Unfortunately, Ms. Dudley went on to have a tortured and abusive relationship with her ex-husband until they finally divorced in 2017.

During their marriage, however, Ms. Dudley had two beautiful children, who are now adults and who still reside with her and maintain good jobs. She vowed to make them a priority and give them the love that she did not have growing up. Her children became everything to her. Unfortunately, the divorce and the child custody battle was brutal and took a harsh toll on Ms. Dudley. This long battle occurred while Ms. Dudley was working at Amideast. She was ultimately awarded custody of her daughter but not her son and spent thousands on lawyers throughout the process. At one point, Amideast was garnishing wages for child support through her paycheck. Ms. Dudley was in a dire financial situation as a result of her divorce.

Ms. Dudley began working at Amideast in 2007, while she was still married. She began as a low-level assistant and worked her way up to a leadership role with a lot of responsibility. While she was working with Amideast, she was able to get her GED and went on to higher education. Despite the trauma of her divorce and toxic relationship with her ex-husband, Ms. Dudley was resilient and still improved her life and career.

Unfortunately, the emotional toll was still too high and she experienced severe anxiety and depression in 2018. She was then diagnosed with chronic post-traumatic stress disorder in 2019 as result of the physical abuse she endured from her ex-husband. She was diagnosed with major depressive disorder in 2022, when she was fired for the instant offense conduct.

Ms. Dudley received mental health treatment and did not give up on herself. Her main priority was creating a stable situation for her and her children and she did just that despite her circumstances. She received an Associate's Degree in Arts and Sciences in 2022 and became employed as a Student Nurse Patient Care Technician at a medical center that same year. Ms. Dudley was employed with them until late 2025. Unfortunately, her employer learned of her charges in this matter and she was fired as a result.

Ms. Dudley did not let that deter her and continued to be employed with a Pediatric Group that hired her in early 2025 part-time. She proved herself and went to nursing school to become an RN while working hard as a CNA at Watchemsprout Pediatrics. She currently still works with this employer. Her employer knows of the

charges and kept her on because of how hard of a worker she is and how reliable she is. Ms. Dudley's employer wrote a letter to the Court explaining not only how valued Ms. Dudley is an employee but also how compassionate and kind she is to their patients and their families. *See* Exhibit 1, Letter from Employer.

Ms. Dudley recently finished nursing school and passed her exam. She is an official RN. This is an enormous accomplishment when considering her past circumstances and obstacles that she has had to overcome.

Ms. Dudley's daughter also wrote a letter to the Court explaining how her mother has spent her whole life doing everything she can for her and her brother. *See* Exhibit 2, Letter from Kiarah Dudley. She explains that "she showed up for us in every way possible. At my high school graduation, she was the loudest person in the room, especially because my father did not attend." *Id*.



Ms. Dudley's sister also describes her resilience over the years and how despite the childhood issues with her mother that Ms. Dudley has stepped up to support her mom in the present day while she is sadly suffering from Parkinson's

disease. *See* Exhibit 3, Letter from Erika Burns. Ms. Burns also explains how her sister has "taken accountability and shown genuine regret for her actions." *Id*.

## B.      Nature and Circumstances of the Offense

This offense was a sad aberration in Ms. Dudley's life. Her actions completely contradicted the otherwise law abiding and hardworking behavior she has exhibited her entire life. It is not representative of her true character and it reflects a time in her life where she was at her absolute lowest. At the time of her offense, Ms. Dudley was severely depressed from a failed marriage and from being the victim of domestic violence for years. Spending money on lawyers and medical bills and alimony sent Ms. Dudley in a horrible downward financial spiral. She was completely broke.

In her time of absolute depression and desperation, she took advantage of the lack of oversight that COVID-19 times brought to the work industry, especially with Amideast where everyone was working remotely. Her behavior at that time is completely unrecognizable to her in the present day. At the time, however, Ms. Dudley let her personal circumstances cloud her judgment and she failed to realize, what she knows now, that this was not a victimless crime. At the time, she did not realize how much her actions would harm the company. She knows now that her actions caused so much harm, not only to the company, but also to herself and to her family.

Notably, Ms. Dudley was drowning so much financially at the time of her conduct that her actions did not result in her being able to live any kind of lavish

lifestyle but rather to just survive. She did not purchase a house or cars and still had to live frugally, as she still does in the present day. The government is incorrect that Ms. Dudley committed this crime out of "greed," and has no basis to suggest so. Notably, an individual with two children living in Maryland must earn $58.98 per hour to support themselves and their family.[1] Ms. Dudley's $67,000 salary after paying taxes was certainly not meeting that threshold. Regardless, Ms. Dudley knows that her personal problems were not her employer's fault and that she never should have resorted to this behavior to try to put a band aid on her dire situation.

Lastly, as discussed above, the government did not charge this conspiracy alleging that Ms. Dudley had any leadership or aggravating role. In fact, the entire allegations are that both individuals assisted *each other* to carry out this scheme. Ms. Dudley acknowledged the loss amount of over $300,000 because she acknowledged the amount was a loss as a result of her conduct and partnership with Mr. Park. The government's attribution of loss to each defendant solely rests on the names of the invoices and/or email used to purchase items, as well as the types of items that were purchased. However, many items, while in Ms. Dudley's name on the invoice were ultimately delivered to Amideast headquarters where items were often received by Mr. Park, who worked in the office – not remotely like she did. For example, the bulk of the gift cards that were purchased through

---

[1] https://livingwage.mit.edu/states/24

Amazon were delivered to the business. The items delivered to Ms. Dudley's personal residence were mostly personal women items and household items.[2]

Regardless, Ms. Dudley acknowledges that she is still responsible for the full amount because she enabled and assisted in the overall scheme. It is relevant though that Ms. Dudley was at a disadvantage from the start of the case. Unlike her co-defendant, she was indicted after Mr. Park was the target of the investigation and already entered a plea. Ms. Dudley did not get the benefit of being a "target" defendant. Had she had counsel at the time of the investigation, like Mr. Park did, she would have not been at this disadvantage.

## II.   The Purposes of sentencing will be Accomplished with a Below Guideline Sentence.

The "Court's overarching duty" is to "'impose a sentence sufficient, but not greater than necessary,'" *Pepper*, 562 U.S. at 493 (quoting 18 U.S.C. § 3553(a)), to comply with "the four identified purposes of sentencing:  just punishment, deterrence, protection of the public, and rehabilitation," *Dean v. United States*, 137 S. Ct. 1170, 1175 (2017); *see also* 18 U.S.C. § 3553(a)(2). Given Ms. Dudley's behavior in the past 5 years since the offense conduct, a sentence of incarceration is not necessary for individual deterrence, to protect the public or for rehabilitation. Notably, a period of incarceration would derail the progress and upward trajectory in her life. It would also put her in a worse financial situation after her release as

---

[2] Some of the household items were things like carpet cleaners, pet hair remover, stain removers. Some of the personal items were hair and nail products as well as gifts for a wedding.

she will not have a job and will not be able to contribute as much to her restitution obligations.

Notably, individuals with no criminal history are far less likely to recidivate. In fact, a study done by the United States Sentencing Commission, which obtained data on a large group of defendants released in 2010, confirmed that individuals in criminal history category one had the lowest rearrest rates (30.2%) and offenders in criminal history category six had the highest rearrest rates (76.2%).[3] There can be no serious argument that Ms. Dudley will recidivate. She presents no risk of recidivism. She has also "suffered substantially due to this prosecution," suffering from anxiety and depression. Both these factors were held to be proper reasons to impose a sentence below the guidelines in *United States v. Gardellini*, 545 F.3d 1089, 1091 (D.C. Cir. 2008) (Kavanaugh, J.).

Lack of a criminal record is a permissible factor for a lower sentence under § 3553(a). *United States v. Delaney*, 651 F.3d 15, 20 (D.C. Cir. 2011). "[A] district court may weigh a defendant's lack of a criminal record, even when the defendant has been placed in a criminal history category of I, in its § 3553(a) analysis." *United States v. Huckins*, 529 F.3d 1312, 1319 (10th Cir. 2008). In *Huckins*, the court sentenced the defendant, whose guidelines range was 78-97 months, to 18 months in prison. *Id*. at 1314. The court considered several factors in doing so, including no prior record;

---

[3] *See United States Sentencing Commission*, Recidivism of Federal Offenders Released in 2010, September 20, 2021, available at https://www.ussc.gov/research/research-reports/recidivism-federal-offenders-released-2010

demonstrated remorse; steady employment prior to being charged; and, improving his life. *Id.*

Evidence suggests that lengthy prison sentences do not have a "chastening" effect and "produce at best a very modest deterrent effect." *Five Things About Deterrence*, Nat'l Inst. Justice, U.S. Dep't of Justice, 1-2 (May 2016). With respect to specific deterrence, research shows conclusively that "[t]he *certainty* of being caught is a vastly more powerful deterrent than the punishment," that "[s]ending an individual convicted of a crime to prison isn't a very effective way to deter crime," and that "[i]ncreasing the severity of punishment does little to deter crime." *Id.* (emphasis in original); *see also* James Austin *et al.*, *How Many Americans Are Unnecessarily Incarcerated?*, Brennan Ctr. For Just., N.Y. Univ. School of Law, 22 (2016) (quoting a 2011 study by criminologists concluding that "across all offenders, prisons do not have a specific deterrent effect. Custodial sentences [jail and prison] do not reduce recidivism more than noncustodial sanctions.").

In addition, United States Sentencing Commission "research has demonstrated that reductions to sentence length and time served do not harm public safety." *Transforming Prisons, Restoring Lives*, Charles Colson Task Force on Federal Corrections, Urban Inst., 21 (Jan. 2016). This is consistent with a "body of research demonstrat[ing] that longer sentences do not reduce recidivism more than shorter sentences." Austin, Brennan Ctr., *supra*, at 35. Some studies have concluded that prison stays longer than 12 to 20 months have diminishing returns, causing higher recidivism. *Id.* Similarly, a 2002 Justice Department study "found that

14

recidivism rates did not differ significantly among those released after serving 6 months or less compared to those serving sentences all the way up to 30 months in prison." *Id*. at 36.

With respect to general deterrence, studies also "indicate that long prison sentences have little or no impact on reducing the criminal behavior of the public at large" because "most people consider immediate circumstances and emotions instead of longer-term legal consequences when acting or reacting." *Id*.

It is often presumed that incarceration is necessary to achieve deterrence, and that the more incarceration imposed, the greater the deterrent effect. However, research has consistently shown that while the certainty of being caught and punished has a deterrent effect, "increases in severity of punishments do not yield significant (if any) marginal deterrent effects."[4] In short, there is little empirical

---

[4] Michael Tonry, *Purposes and Functions of Sentencing*, 34 Crime & Just. 1, 28 (2006) ("Three National Academy of Science panels . . . reached that conclusion, as has every major survey of the evidence."); *see also* National Institute of Justice, *Five Things About Deterrence*, at 1 (May 2016), https://www.ojp.gov/pdffiles1/nij/247350.pdf (stating, among other things, that "[i]ncreasing the severity of punishment does little to deter crime," and "[t]he certainty of being caught is a vastly more powerful deterrent than the punishment"); Ellen Raaijmakers et al., *Exploring the Relationship Between Subjectively Experienced Severity of Imprisonment and Recidivism: A Neglected Element in Testing Deterrence Theory*, 54 J. of Rsch. in Crime and Delinq. 1, 4 (2017) ("[T]he available evidence points toward a null or a slightly criminogenic effect of imprisonment but has rarely found support for a clear specific deterrent effect."); Daniel S. Nagin, *Deterrence in the Twenty-First Century*, 42 Crime & Just. 199, 201 (2013) ("[T]here is little evidence of a specific deterrent effect arising from the experience of imprisonment compared with the experience of noncustodial sanctions such as probation.  Instead, the evidence suggests that reoffending is either unaffected or increased."); Zvi D. Gabbay*, Exploring the Limits of the Restorative Justice Paradigm: Restorative Justice and White Collar Crime*, 8 Cardozo J. Conflict Resol. 421, 447-48 (2007) ("[C]ertainty of punishment is empirically known to be a far better deterrent than its severity").

support for the prospect that a lengthy period of confinement will be any more effective at deterring Ms. Dudley or others from committing this offense. And, indeed, the most effective deterrent is the certainty of punishment, not the severity of punishment. *See, e.g.*, *United States v. Bannister*, 786 F. Supp. 2d 617, 668 (E.D.N.Y. 2011) ("[G]iven that effective deterrence arises from certainty, not harshness, of punishment, our society might better consider whether our scarce resources would be better spent, not on extended incarceration, but on eliminating social conditions encouraging crime and on non-incarceratory techniques").

Congress has recognized that "imprisonment is not an appropriate means of promoting correction and rehabilitation." 18 U.S.C. § 3582(a). Community-based sanctions provide better opportunities for rehabilitation, and the Court can further serve the purposes of sentencing by imposing restrictive conditions of supervised release. *See Gall*, 552 U.S. at 48 (supervised release is a "substantial restriction of freedom").

Aside from the punishment Ms. Dudley has already endured by being arrested and indicted in federal court, the collateral consequences that attend to her felony conviction cannot be overstated. District judges have recognized the life-long, damaging impact of a felony conviction can be relevant to sentencing. For example, in another conviction, the Honorable Amit P. Mehta observed:

> People are all very quick to suggest that the only real punishment is a jail sentence, and it's just not true. People can suffer in many different ways and do suffer in many different ways a result of their conduct and that is something every judge, at least on this court, I

16

believe, understands, and takes into account when they're fashioning the appropriate sentence.[5]

Ms. Dudley has certainly suffered immensely as a result of her conviction. She lost her job in 2025 when her employer found out about these charges. She is now a felon, which could impact her nursing license and future employment. Also, she now has over $300,000 to pay back. Lastly, she has had to endure the embarrassment of what she did in front of family and friends, including her own children. Notably, her current significant other expressed his disbelief to probation as to her offense conduct because of how out of character and unrepresentative it is of the current Ms. Dudley.

### III.    The Need to Avoid Unwarranted Sentencing Disparities

Whether any difference among sentences is warranted or unwarranted depends on the individual circumstances of each case and their relationship to the purposes of sentencing. "Unwarranted disparity is defined as different treatment of *individual* offenders who are similar in relevant ways, or similar treatment of *individual* offenders who differ in characteristics that are relevant to the purposes of sentencing." U.S. Sent'g Comm'n, *Fifteen Years of Guidelines Sentencing: An Assessment of How Well the Federal Criminal Justice System Is Achieving the Goals*

---

[5]*United States v. Andrew Cavanaugh*, 21-cr-362 (APM), Sentencing Transcript at pg. 29.

*of Sentencing Reform* 113 (2004).  In this jurisdiction, furthermore, it is not unusual

for wire fraud defendants to receive a sentence of probation:

- *US v. Carl Wilson, Jr.*, 24-cr-133 (ACR): Mr. Wilson received a

  sentence of three years' probation after admitting to a fraud scheme

  that caused an overall loss of almost a million dollars. Mr. Wilson's

  guidelines were 10-16 months because he agreed to individual loss

  attribution of over $95,000. This fraud scheme involved the misuse of

  two UPS accounts, securing access to the organization's account to use

  it to sell shipping labels.

- *US v. Lori Isabell Morgan*, 24-cr-232 (RC): The Court imposed 48

  months' probation with 12 non-consecutive weekends of intermittent

  incarceration and 12 months of home detention with location

  monitoring. Ms. Morgan admitted to fraudulently applying for COVID-

  19 relief loan relief in the amount of $149,900, some of which she spent

  on vacations. Her guideline range was 12-18 months, but the Court

  granted a variance because she did well on pre-trial release, was a

  mother of seven children, and had cognitive limitations when

  committing the offense conduct.

- *US v. Germaine Graham*, 23-cr-117 (RC): Mr. Graham stole $253,010

  from his company where he was entrusted as the office manager.

  Despite the sentencing guidelines being 24-30 months, the Court

  imposed a sentence of 60 months' probation. Similar to Ms. Dudley,

18

Mr. Graham also had many personal and financial struggles, including being the victim of domestic violence.

- *US v. Nkiru Uduji*, 19-cr-289 (BAH): Ms. Uduji received a sentence of 3 years' probation for committing health care fraud with a loss of over $500,000. She was the sole caretaker of her children and her ex-husband was physically and mentally abusive to her. Also similar to Ms. Dudley, the money that Ms. Uduji fraudulently obtained was not used to live a lavish lifestyle but to simply survive.

- *US v. Aaron Alexander*, 18-cr-224 (TFH): The Court imposed 60 months' probation after Mr. Alexander admitted to using his position as treasurer of the US Bureau of Engraving and Printing to fraudulently divert almost all of the organization's financial resources to his personal use. His guidelines were 8-14 months. While his guidelines are slightly lower than Ms. Dudley's, the position of trust that Mr. Alexander abused was far graver. Similar to Ms. Dudley, Mr. Alexander also did well on pretrial release and vowed to pay back his restitution.

This Court has also granted downward variances in fraud cases. For example, in *US v. Romero Da Costa Neto*, 23-cr-371 (CJN), the Court imposed a sentence of 2 months' incarceration despite the 8–14-month guideline range in an insider trading case. Unlike Ms. Dudley, Mr. Da Costa Neto did not have the same troubled background and history as well as financial struggles. Similar to Ms.

Dudley, however, this offense was an aberration in Mr. Da Costa Neto's otherwise law-abiding life. This Court also granted a variance in *US v. Rosa Gana*, 19-cr-305 (CJN), in a health care fraud case where the defendant defrauded the DC Medicaid Program out of more than $400,000. The Court imposed a sentence of 13 months' incarceration despite the guidelines of 18-24 months. This case is also distinguishable from Ms. Dudley's case, not just because of the higher loss amount, but also because the offense conduct lasted over 5 years.

## II.   A Variance is Warranted Because the Loss Amount Guideline is Not Based on Empirical Evidence or National Experience and Fails to Promote Any Purpose of Sentencing.

Although the Guidelines are one factor to consider under Section 3553(a), the Court should conclude that a Guideline sentence in this case, even under the plea agreement's proposed Guideline range, is greater than necessary to accomplish the purposes of sentencing.  Accordingly, a Guideline sentence is inappropriate even as a starting point.

When Congress enacted the Sentencing Reform Act of 1984, it directed the Commission to promulgate guidelines that "assure the meeting of the purposes of sentencing," 28 U.S.C. § 991(b)(1)(A), and to use average sentences imposed and prison time actually served in the pre-guidelines period as a "starting point."  28 U.S.C. § 994(m).  After initially setting the Guidelines, the Commission was then to continually review and revise the guidelines in light of sentencing data, criminological research, and consultation with frontline actors in the criminal justice system.  *See* 28 U.S.C. § 991(b)(1)(C), § 991(b)(2), § 994(o), § 995(13), (15),

(16). The original Commissioners failed to design the guidelines based on the purposes of sentencing because they could not agree on which purposes should predominate, and instead based the guidelines on an empirical study of time served for various offenses before the guidelines. *See* USSG, Ch. 1 Pt. A(3); Justice Stephen Breyer, *The Federal Sentencing Guidelines and the Key Compromises Upon Which They Rest*, 17 Hofstra L. Rev. 1, 7 (1988).

In *Rita v. United States*, 551 U.S. 338, 350 (2007), the United States Supreme Court stated that it may be "fair to assume," at least as a general matter, that the guidelines "reflect a rough approximation" of sentences that "might achieve § 3553(a)'s objectives" because (1) the original Commission used an "empirical approach," beginning "with an empirical examination of 10,000 presentence reports setting forth what judges had done in the past" and (2) the Commission can review and revise the guidelines based on judicial feedback through sentencing decisions, and consultation with other frontline actors, civil liberties groups, and experts. *Id.* at 348-50. The Court in *Rita* also recognized, however, that *not all guidelines* were developed in this manner. *See Gall*, 552 U.S. at 46 n.2 (2007); *Kimbrough v. United States*, 552 U.S. 85, 96 (2007). When a guideline "do[es] not exemplify the Commission's exercise of its characteristic institutional role," because the Commission "did not take account of 'empirical data and national experience,'" the sentencing court may conclude that the guideline "yields a sentence 'greater than necessary' to achieve § 3553(a)'s purpose, *even in a mine-run case*." *Id.* at 109-10 (emphasis added).

Section 2B1.1, the guideline applicable to the loss amount calculation in this case, is not based on empirical data of past practice or on national experience and, therefore, should not be followed. When the Commission adopted the original guidelines in 1987, it "decided to abandon the touchstone of prior past practice" with respect to white collar offenses. Justice Stephen Breyer, *The Federal Sentencing Guidelines and the Key Compromises Upon Which They Rest*, 17 Hofstra L. Rev. 1, 22-23 (1988). Unlike most other offenses, "economic crime guidelines were ratcheted up in excess of . . . prior judicial sentencing data." Mark W. Bennett, et al., *Judging Federal White-Collar Fraud Sentencing: An Empirical Study Revealing the Need for Further Reform*, 102 Iowa L. Rev. 939, 950 (2017).

The Commission's rationale for the Guidelines they adopted was deterrence, however, the Guideline was not based on empirical evidence. The empirical research regarding white-collar offenders shows no difference between the deterrent effect of imprisonment and that of non-prison sanctions like probation. *See* David Weisburd et al., Sp*ecific Deterrence in a Sample of Offenders Convicted of White Collar Crimes*, 33 Criminology 587, 589 (1995). "[T]here is no decisive evidence to support the conclusion that harsh sentences actually have a general and specific deterrent effect on potential white-collar offenders." Z. Gabbay, supra, 8 Cardozo J. Conflict Resol. 421, 448-49.

The fraud guideline is not based on empirical data of past practice or on national experience. Because the Commission failed to rely on empirical data or national experience in promulgating or amending the loss amount enhancements in

22

§ 2B1.1, and thus failed to fulfill its institutional role, this Court is free to disagree, on reasoned policy grounds, with its recommendation. *See Spears v. United States*, 129 S. Ct. 840, 843 (2009); *Kimbrough*, 552 U.S. at 101-02, 109-10; *Rita*, 551 U.S. at 351, 357.

## **CONCLUSION**

For the above reasons, Ms. Dudley respectfully requests that the Court fashion a non-incarceration sentence. If the Court is considering incarceration, Ms. Dudley respectfully requests that she serve time on the weekends so that she can remain employed.

Respectfully submitted,

A.J. KRAMER
FEDERAL PUBLIC DEFENDER

_____/s/_____
Maria N. Jacob
Assistant Federal Public Defender
625 Indiana Ave. NW, Ste. 550
Washington, D.C. 20004
(202) 208-7500
Maria_jacob@fd.org